# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

October 2, 2009

Charles R. Fulbruge III
Clerk

No. 08-40813

ALEXANDER TRUONG

Third Party Defendant - Appellant

v.

ST PAUL FIRE & MARINE INSURANCE COMPANY

Third Party Plaintiff - Appellee

Appeal from the United States District Court
for the Southern District of Texas
USDC No. 3:06-CV-00237

Before JONES, Chief Judge, and PRADO and HAYNES, Circuit Judges.

PER CURIAM:[*]

This case involves a maritime insurance dispute that was initially brought by Business Loan Center, LLC ("BLC"), a loss payee, for the insured value of the shrimp vessel ST. LOUIS. The ST. LOUIS was covered under an insurance policy issued by St. Paul Marine ("St. Paul") and was damaged by Hurricane Rita. St. Paul paid for repairs, but BLC contended that it was entitled to have the ST. LOUIS declared a constructive total loss, which would have required St. Paul to pay an agreed value of $400,000 rather than repairing the vessel. The

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

named insured, Alexander Truong ("Alexander"), who was joined as a third-party defendant on St. Paul's counterclaim for declaratory judgment, also filed contract and extra-contractual claims against St. Paul. The district court conducted a bench trial and found that St. Paul did not breach the Policy or act in bad faith. Only Alexander appeals. For the reasons set forth below, we affirm.

## I. FACTS AND PROCEDURAL HISTORY

Most of the facts of the present case were never in dispute. The ST. LOUIS was an 85.3-foot-long steel hull commercial shrimp boat built in 1996. At all relevant times, Alexander was the titled owner of the ST. LOUIS. In October 2001, BLC loaned Alexander $420,000 to purchase the ST. LOUIS.[1] In return, BLC acquired a first preferred ship mortgage over the vessel. After closing on the loan, Alexander returned to his residence in California and left his father, Luis Truong ("Luis"), in charge of operating the ST. LOUIS. Alexander defaulted on the loan before Hurricane Rita, but BLC never foreclosed on the vessel.

David McGruder, with Allied Security Insurance, was Alexander's insurance broker and agent. G&M Marine ("G&M") was at all relevant times the managing general agent for St. Paul. McGruder procured from G&M a marine hull insurance policy, specifically St. Paul Policy No. OM04200480 ("the Policy"), covering the ST. LOUIS from April 16, 2005 to April 16, 2006. Both BLC and Alexander were insureds. The Policy states:

> No recovery for a constructive total loss shall be had hereunder unless the expense of recovering and repairing the vessel named herein shall exceed the agreed valuation.

---

[1] It is undisputed that Alexander falsely verified several untruths contained in his loan application.

2

The Policy states that the agreed value for the ST. LOUIS was $400,000. It also contains a Sue and Labor Clause:

> In any case of loss or misfortune it shall be lawful and necessary for the assured, their factors, servants and assigns, to sue, labor and travel for, in and about the defense, safeguard and recovery of the vessel named herein, or any part thereof, without prejudice to this insurance, to the charges whereof this Company will contribute as hereinafter provided. It is agreed that the acts of the assured or this Company, or their agents, in recovering, saving and preserving the property insured in case of disaster shall not be considered a waiver or an acceptance of an abandonment, nor as affirming or denying any liability under this policy; but such acts shall be considered as done for the benefit of all concerned, and without prejudice to the rights of either party.

Under the Application Clause, the Policy provides:

> The Assured agrees and understands that if the Assured has concealed or misrepresented any material fact or circumstances, or conceals or misrepresents any material fact or circumstance during the applicable term of this insurance, coverage under this policy will be forfeited whether before or after a loss, which otherwise was provided.

The Policy also indicates that a change in management of the vessel voids the Policy without the consent of St. Paul.

On September 24, 2005, the ST. LOUIS was severely damaged in Hurricane Rita as the storm passed through the vessel's home port of Sabine Pass, Texas. Diers & Associates, a surveying company owned by Ken Diers ("Diers"), was hired by G&M to locate and identify vessels damaged by the storm. Ricky Milam, an employee of Diers & Associates, located the ST. LOUIS beached on its side in very shallow water in a Sabine Pass parking lot. Milam did not inspect the ST. LOUIS; instead, he observed the vessel from a distance. His initial attempts to contact Alexander about the ST. LOUIS were unsuccessful.

3

Alexander and Luis testified that they also located and inspected the ST. LOUIS a few days after Hurricane Rita. They made no effort to file an insurance claim or notify BLC about the loss at that time. Alexander returned to California immediately after inspecting the vessel, leaving his father in charge of taking care of any insurance claim with St. Paul. No effort was made by Luis or Alexander to recover, save, preserve, or secure the vessel after the Hurricane.

After Alexander left Texas, Milam was able to contact Luis. Luis identified himself over the telephone as Alexander, the owner of the vessel. The district court found that throughout the claims handling process, which is described below, Alexander and Luis misrepresented to St. Paul and its agents that Luis was Alexander.

Diers hired Laredo Construction, Inc. to salvage the ST. LOUIS. On October 8, 2005, Laredo Construction lifted the ST. LOUIS with a crane and returned it to the water. No one associated with Diers & Associates, G&M, or St. Paul attended the salvage operation. The ST. LOUIS was then delivered to a dock at K&B Marine ("K&B") in Port Arthur, Texas. The salvage cost was $64,480. In addition, Diers & Associates hired K&B to conduct temporary repairs to fuel leaks at a cost of $10,000. K&B also charged Diers & Associates $1,880 to dock the St. Louis at its facility from October 8, 2005 to November 23, 2005.

On October 17, 2005, Milam conducted a topside damage inspection and concluded that the ST. LOUIS could be repaired for $215,000. The underwater portions of the hull could not be inspected for damage because K&B did not have a dry dock.

On November 1, 2005, Milam met with Luis to inspect the vessel. Luis told Milam that he wanted the ST. LOUIS totaled to help pay off the vessel. Milam told Luis that, in his opinion, he thought the vessel could be repaired.

On November 7, 2005, Diers sent a letter to Alexander requesting that he obtain written bids for the estimated costs of repairs. Alexander did not respond to the letter. Diers's notes indicate that, on November 22, 2005, he spoke with BLC's representative, George Harrigan, who told Diers that Alexander wanted the vessel declared a constructive total loss.

In early November 2005, Luis met with Jaime Garcia, a representative of Palacios Shipyard, to get a quote for repairs on the ST. LOUIS. Luis identified himself as Alexander. Luis did not indicate that he wanted the ST. LOUIS declared a constructive total loss during this meeting, but he did discuss what repairs were necessary. On November 23, 2005, Palacios Shipyard issued a repair bid of $215,500 to repair the damages noted in Diers & Associates' report of October 24, 2005. The bid noted that "[u]pon its inspection by shipyard should damages be more severe than sighted by surveyor, costs will be adjusted."

On December 1, 2005, Garcia met with Luis to get permission to tow the vessel to Palacios Shipyard for a drydock inspection of the hull. Luis signed the towing agreement as Alexander. On December 28, 2005, the ST. LOUIS was towed to Palacios, Texas, where it would be placed on dry dock, to assess the ship's underwater hull damage. The cost for towage from K&B to the shipyard was $7,000. Garcia required written authorization to perform the tow but not to commence repairs.

On January 4, 2006, the ST. LOUIS was placed on drydock. Luis and Milam inspected the underwater hull damage at this time. With Milam's notes, Diers drafted revised repair specifications, which he gave to Palacios Shipyard. The shipyard then priced the specified repairs and drafted a revised repair proposal, which it gave to Milam and Diers on January 9, 2006. The new quote increased the repair costs from Milam's initial estimate of $215,000 to $320,500.

On January 12, 2005, Diers forwarded the $320,500 repair proposal to Dennis Robbins, the claims manager for G&M who was responsible for deciding

how to handle the claim on behalf of St. Paul. Robbins decided that the ST. LOUIS would not be accepted as a constructive total loss and would instead be repaired. Robbins stated in his deposition, which was filed by BLC in the district court and relied upon by Alexander here, that the $7,000 towing fee was not part of the constructive loss amount determination. Based on Robbins's decision to repair, St. Paul authorized Palacios to commence repairs. St. Paul did not inform Luis, Alexander, or BLC of the increased cost of repairs before the repairs commenced. Luis came back several times to observe repairs of the ST. LOUIS, ask questions about progress, and point out things that needed to be added to the repair list.

On January 31, 2006, Diers & Associates forwarded "Preliminary Damage Estimates" to BLC for 19 of BLC's mortgaged vessels, including the ST. LOUIS. It informed BLC of:

Salvage costs of $64,400.00;

Towing charges of $7,000.00;

Hull repairs estimated at $320,500.[2]

Repairs underway at shipyard in Palacios, Texas.

On February 22, 2006, BLC made a demand that the vessel be declared a constructive total loss. At that point, repairs in the amount of $257,000 had already been completed. St. Paul instructed Palacios to halt repairs. St. Paul then attempted to sell the ST. LOUIS, but the only bid was $75,000. St. Paul reversed itself again and ordered that the ST. LOUIS be repaired. After final repairs were completed during this litigation, the ST. LOUIS was sold with the district court's concurrence and by agreement of the parties for only $185,000.

BLC sued St. Paul as an additional insured under the Policy for

---

[2] This document does not list approximately $11,800 in temporary repairs and dockage fees that Alexander contends, together with these amounts, form the total "undisputed" figures that should be used to calculate the constructive total loss.

improperly adjusting the claim. St. Paul impleaded Alexander, alleging that he was a necessary party. Alexander answered St. Paul's third party complaint and asserted a counterclaim, which largely tracked BLC's original complaint. A bench trial was held by the district court, after which it issued its "Final Judgment" and "Findings of Fact and Conclusions of Law," holding in favor of St. Paul and dismissing the claims of BLC and the third-party counterclaims brought against St. Paul by Alexander. The district court held that St. Paul did not breach the Policy because: (1) the policy was void due to misrepresentations by Alexander; (2) the policy was void under a change of management clause; (3) Alexander's failure to tender the vessel to St. Paul and his election to have the vessel repaired meant that St. Paul did not have to declare the vessel a constructive total loss; and (4) the amounts allocable to the calculation of a constructive total loss did not exceed the agreed value of $400,000.

Alexander filed his notice of appeal on August 13, 2008, appealing the district court's dismissal of his counterclaim against St. Paul. Neither BLC nor St. Paul appealed any aspect of the judgment below.

## II. STANDARD OF REVIEW

"'The standard of review for a bench trial is well established: findings of fact are reviewed for clear error and legal issues are reviewed de novo.'" *Mid-South Towing Co. v. Exmar Lux*, 418 F.3d 526, 531 (5th Cir. 2005) (quoting *Kona Tech. Corp. v. S. Pac. Transp. Co.*, 225 F.3d 595, 601 (5th Cir. 2000)). The interpretation of the terms of an insurance policy is a matter of law, which this court reviews de novo. *See Am. States Ins. Co. v. Bailey*, 133 F.3d 363, 369 (5th Cir. 1998).

## III. DISCUSSION

We need not consider whether any misrepresentation or change in ownership voids the policy or whether Alexander effectively abandoned the ship, because we conclude that the district court did not commit clear error in finding

that the amounts properly allocable to "recovery and repair" fell below the necessary $400,000 threshold. In calculating the amount, Alexander relied upon the following "undisputed" figures: (1) salvage costs of $64,480; (2) towing charges of $7,000; (3) temporary repairs and dockage: $11,880; and (4) hull repairs estimated at $320,500, for a total of $403,860. He also alludes to "other numbers" but makes little effort to prove any additional numbers; he certainly did not obtain any findings from the district court on any other numbers.[3]

If any one of these costs could not be included in the constructive total loss calculation, then the total would fall below the $400,000 threshold. Alexander relies upon *Northern Barge Line Co. v. Royal Insurance Co., Ltd.*, 1974 A.M.C. 136 (N.D. Iowa 1973), *aff'd*, 492 F.2d 1248 (8th Cir. 1974) to support his position that all of the above charges may be included. St. Paul, for its part, argues that only the $320,500 may be included and that the remaining charges are subject to a separate clause – the "Sue and Labor" clause quoted above. We agree with Alexander that the fact that some costs may be payable under the Sue and Labor clause does not prevent their consideration as a "recovery or repair" cost for purposes of the constructive total loss calculation. We conclude, however, that Alexander failed to conclusively prove that the towing charges were a "recovery" or "repair" expense. The testimony on this point was mixed – Robbins contended that it was not, others agreed with the suggestion that it was. Alexander argues that in calculating repair and recovery costs "it is proper to include the

---

[3] One such number was $20,000 for electronics allegedly stolen from the ship. The storm itself did not damage the electronics. Further, far from agreeing that the electronics were stolen in the aftermath of the storm, the district court's findings suggested that the theft either predated the storm or was a complete fabrication. It noted that, in preparation for the storm's arrival, many boat owners removed electronic items from their vessels to prevent theft, implying that is what was done here. It also pointed out that these same electronics were the subject of an earlier pre-storm theft claim. Alexander also claims that unspecified "engine repairs" should have been included under "company policy" even though such repairs were not covered by the Policy. Again, the district court did not find in Alexander's favor on these allegations.

expenditure necessary to deliver the ship from its peril to a port of safety," relying on a treatise. L. Burglass, MARINE INSURANCE AND GENERAL AVERAGE IN THE UNITED STATES 109 (3rd ed. 1991). However, he cites no testimony that the tow to Palacios Shipyard was for the purpose of transporting it to a "port of safety" or that it was in "peril" at the time of the transport. The evidence, actually, is to the contrary – the ST. LOUIS was already salvaged and docked at K&B before the towing fee was incurred. Palacios treated the towing differently from the repair costs, and Robbins stated that the towing was not a repair cost. If the towing fee is subtracted from the "undisputed figures" that Alexander relies upon, the number becomes less than $400,000. Thus, we need not examine other amounts from the calculation to conclude that, on the record here, the district court's finding that the "constructive total loss" amount was less than $400,000 was not "clearly erroneous." Accordingly, St. Paul did not breach its contract or act in bad faith in failing to declare the ST. LOUIS a "constructive total loss."

## IV. CONCLUSION

AFFIRMED.